IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| LINDA JORDAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:10-cv-0051 |
| ) | Judge Trauger |
| KOHL's DEPARTMENT STORES, INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Pending before the court is the defendant's Motion for Summary Judgment (Docket No. 54), to which the plaintiff has responded (Docket No. 64), and the defendant has filed a reply in support (Docket No. 66). For the reasons discussed herein, the defendant's motion will be granted, and this case will be dismissed.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

The plaintiff, Linda Jordan, began working for the defendant Kohl's Department Stores, Inc. ("Kohl's"), in October 2003, as a part-time "Ad Set Associate" at Kohl's Hendersonville, Tennessee store.[1] In 2005, the plaintiff was pursuing a degree in criminal justice, and, in

---

[1] Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket No. 65) and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The plaintiff, in responding to the defendant's Statement of Materials Facts, made a general objection to any statement of fact "to the extent [it] state[s] as fact unverified hearsay, the beliefs of various individuals, or rel[ies] upon unauthenticated documents, and therefore recite[s] facts that would be inadmissible at trial. Moreover to the extent Defendant's Statement of Undisputed Material Facts relies on documents, Plaintiff objects that the statements reference [] a portion of

1

connection with that pursuit, she requested a transfer to Kohl's Loss Prevention Department (LPD). Kohl's granted this request, and the plaintiff began working in the LPD in February or March 2005.

The plaintiff received performance reviews each July. While these reviews from her LPD supervisor, William Childs, were generally positive, her 2006 and 2007 evaluations flagged a concern about her workplace attitude. In her 2006 review, Childs stated that the plaintiff needed "to develop better communication techniques in order to prevent coming across too abrasive," and that, when something upset the plaintiff at work, she needed to "learn how to deal with her attitude and temper." (Docket No. 65 at 2.) And in her 2007 review, Childs stated that the plaintiff "is extremely passionate about her job and overall performance but will sometimes allow her passion to frustrate her when dealing with a situation," and, "on occasion, this results in her communication about the concern to come across as though she has a lack of respect for others." (*Id.*)

In July 2006, Elisa Hudson, a Territory Human Resources Manager for Kohl's, assumed responsibility for the human resources function at the Hendersonville store. Hudson is based in Indiana and, during the relevant time period, she was responsible for human resources oversight of approximately 130 stores. (Docket No. 57 at 1.) Hudson stated in her affidavit that, due to her broad oversight responsibilities, she rarely ventures into the stores to conduct investigations

---

the document, taking such statements out of context. Accordingly, when plaintiff 'admits' such facts, Plaintiff is admitting only that the document contains such fact, not that the underlying fact is true." (Docket No. 65 at 1.) As discussed herein, the plaintiff has not come forward with sufficient (or any) evidence that her termination was in retaliation for filing her EEOC Charge, and, therefore, the fact that the defendant may have submitted potentially inadmissible evidence as part of its filings in support of its motion here is of little moment.

herself, but, rather "partners" with management personnel in the store and "guide[s] investigations" by instructing management personnel as to who to interview and how to collect information. (*Id.* at 1-2.) In a serious situation, such as where an employee might face termination, after Hudson collects the relevant information, she and her supervisor, Peter Riley, make the ultimate determination as to how to proceed. (*Id.*)

On August 28, 2007, the plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC), asserting race and gender discrimination and unlawful retaliation. (Docket No. 56 Ex. 1 at 77.) This Charge alleged that Childs had made "racially insensitive remarks" in the workplace and that, in June 2007, the plaintiff had been refused a promotion to Loss Prevention Manager "in retaliation" for opposing "unlawful employment practices." (*Id.*) The plaintiff further alleged that she was "discriminated against with respect to pay," as she "was paid less" than another lost prevention employee, Thomas Crook. (*Id.*) According to Hudson's affidavit, she and other high level Kohl's officers researched these allegations of pay and promotion disparities when the plaintiff first raised them in June 2007 and determined that (1) the difference in pay was the result of Crook's significant experience in loss prevention, and (2) there was no such position as Loss Prevention Manager in the plaintiff's district. (Docket No. 57 at 4-5.) Hudson maintains that she was unaware of any racial discrimination allegations prior to the filing of the Charge. (*Id.* at 19.)

On the evening of Sunday, September 16, 2007, the plaintiff sent an e-mail regarding Janna Garton, who was an assistant manager at the Hendersonville store. (*Id.* at 6.) Garton was cc'd on the e-mail, which was sent to senior managers at the store, including Childs, and District Manager Jana Wilkinson. The e-mail, in a remarkably hostile tone, accused Garton of currently

3

"stand[ing] around talking about nothing" rather than overriding the automatic lighting system, which, at the end of the day on Sunday, was prematurely turning off some of the lights in the store while the store was still open. (Docket No. 57 Ex. 2 at 4.) Garton replied to the managers in an e-mail the next day, stating that she had gotten held up by various tasks and had not been able to manually override the lights for a few minutes. (*Id.* at 5.) Garton also stated that the plaintiff was "constantly looking for a reason to be hostile," regularly harassed her, and repeatedly referred to overweight people as "fat asses" while at work. (*Id.*)

Wilkinson forwarded this e-mail exchange to Hudson for her review. (Docket No. 57 at 6.) Hudson states that she followed up with Garton, and she got the impression that Garton was afraid of the plaintiff and "walked on egg shells" around her. (*Id.* at 7.) Hudson informed Garton that Garton (as a manager) needed to assert some control over the plaintiff, and she also instructed store manager Kurt Moody to meet with Garton and the plaintiff to help iron out their differences. (*Id.*) According to Hudson, this meeting occurred and apparently resolved any conflict between the two for the moment. (*Id.*)

Over the months that followed, Hudson received and reviewed numerous other complaints about the plaintiff's attitude. Indeed, Hudson stated that, from September 2007 to December 2007, she received six independent complaints from the plaintiff's co-workers, each alleging that the plaintiff had been dishonest, "rude," "abrupt," "nasty," "condescending" and generally unpleasant to work with on specific occasions. (Docket No. 57 at 7-11.) In one of the complaints, which Hudson describes as "very serious," fellow loss prevention associate David Brown complained that the plaintiff had called him at home one morning to chastise him about a loss prevention investigation that resulted in the termination of an African-American employee

4

and that the plaintiff "accused [Brown] of being a racist." (*Id.* at 11.) Also, on December 11, 2007, Kelli Barger, who also worked in loss prevention, lodged a complaint that described the plaintiff's "nasty attitude" and also complained that the plaintiff made inappropriate remarks about overweight people. (*Id.* at 8.)

In light of these complaints, Hudson conducted a review of the plaintiff's employment file, and she came across an August 2004 "Associate Counseling Form," which noted that the plaintiff and the Hendersonville store manager at the time had had "many verbal discussions about the treatment of Kohl's associates" and that there was "an ongoing pattern" in which the plaintiff's abusive treatment of her co-workers created an "unpleasant work environment."[2] (Docket No. 57 Ex. 2 at 16.)

At Hudson's direction and instruction, on January 5, 2008, Childs (with Moody as a witness) met with the plaintiff to discuss "the more serious allegations" that Hudson had received against the plaintiff. (*Id.* at 13.) While this meeting was apparently tense, Hudson hoped that it would result in the plaintiff being able to continue to work productively at Kohl's (*Id.*)

In March 2008, Point of Sale Supervisor at the Hendersonville store, Mary Osborne, submitted a complaint to Hudson. According to Osborne, she (Osborne) had informed Garton about suspicions that she had that an associate – who happened to be friends with the plaintiff – was stealing. (Docket No. 59 at 4.) Osborne alleges that the plaintiff, upon hearing about all of

---

[2]Additionally, Hudson maintains that she has come across three additional written complaints from July 2006, in which co-workers likewise complained that the plaintiff had yelled at them and treated them in an aggressive and unprofessional manner. (Docket No. 57 at 10.)

this, called Osborne at home and was demanding and hostile, aggressively and defiantly challenging every attempt that Osborne made to explain her decision to report the alleged theft before finally hanging up on Osborne. (*Id.* at 4-8.)

Additional complaints regarding the plaintiff were reported to Hudson in March 2008. Most notably, on March 12, 2008, Garton reported to Hudson that the plaintiff had told Katie Osborne (Mary Osborne's teenage daughter and a Kohl's employee) that she would "knock Janna [Garton] to the ground." (Docket No. 57 at 16.) Katie Osborne subsequently confirmed to Hudson that this incident had occurred. (*Id.*) On March 21, 2008, Kohl's associate Kimberly Peterson Koch filed a complaint with Hudson charging that the plaintiff had been harassing, rude, and combative with Koch and had generally been a "bully." (*Id.*)

On or about March 18, 2008, Childs and Wilkinson, at Hudson's direction, met with the plaintiff to discuss these allegations and to advise her that her conduct could result in disciplinary action, including termination. Following this meeting, the plaintiff called Hudson. In her affidavit, Hudson maintains that the plaintiff's tone during their conversation was "completely inappropriate"; that is, the plaintiff was "loud," "spoke over" and interrupted Hudson. (Docket No. 57 at 17.) Hudson states that the plaintiff refused to listen to her, accused her of taking management's side, and was generally fixated on finding out who had been complaining about her. (*Id.*) Hudson contends that this phone conversation validated many of the complaints she had been receiving about the plaintiff, and, after consulting with her supervisor Peter Riley, she made the decision to terminate the plaintiff, citing a "pattern of inappropriate conduct," which included a physical threat to another employee, all of which justified termination under Kohl's written guidelines and procedures. (*Id.* at 18.)

6

Riley also submitted an affidavit. (Docket No. 58.) He stated that he had a phone conversation with the plaintiff in June 2007 regarding her concerns over pay and promotion and that he also had found the plaintiff to be hostile and rude, once it became clear that she would not get what she wanted. (*Id.* at 2-3.) Riley stated that he agreed with Hudson that the termination was appropriate at least because of the phone call to Brown and the physical threat to Garton. (*Id.*) Riley also stated that, at the time he consulted with Hudson and they made the decision to terminate, he did not know that the plaintiff had filed her August 2007 EEOC Charge. (*Id.* at 4.)

Mary and Katie Osborne, David Brown, and Kelli Barger (only Mary Osborne still works at Kohl's) all submitted affidavits in support of the defendant's motion, stating that the plaintiff was "intimidating," "bossy," and "rude," and they recounted numerous incidents in which the plaintiff had acted in a hostile and unprofessional manner toward them, only some of which they had reported to Hudson. (Docket Nos. 59-62.) All of the affiants disclaimed any connection between their complaints and the plaintiff's August 2007 EEOC Charge – rather the affidavits present the unanimous opinion that the plaintiff was very difficult to work with and deserved termination.[3] (*Id.*)

The plaintiff also submitted an affidavit. (Docket No. 64 Ex. 1.) The plaintiff cites her generally favorable employment reviews and claims that, after filing her Charge in August 2007, she was subject to "extremely heightened scrutiny" and became the unique "focus of endless accusations and investigations" (*Id.*) As to the specific accusations of misconduct against her, the plaintiff denies ever calling David Brown or threatening Garton. (*Id.*) While she admits

---

[3] Mary Osborne also stated that, the day after the plaintiff was terminated, she found that her mailbox had been "burned to the ground," which she suspected was the work of the plaintiff. (Docket No. 59 at 7.)

occasionally making negative comments about overweight people and calling Mary Osborne, she denies that those comments justified termination or that the conversation with Osborne was "threatening." (*Id.*) She maintains that her personality had always been accepted at Kohl's, until she filed the EEOC Charge.[4] (*Id.*)

## ANALYSIS

**I.      Summary Judgment Standard**

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren,* 578 F.3d 351, 374 (6th Cir.2009); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]." *Moldowan,* 578 F.3d at 374.

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting

---

[4]The plaintiff's statement that, "within just a few weeks of filing my EEOC charge, I was confronted with complaints about my personality that had never been made before" ignores the series of performance evaluations that had criticized the plaintiff's attitude. (Docket No. 64 Ex. 1 at 2.)

8

*Anderson*, 477 U.S. at 249). But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson,* 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff. *Moldowan,* 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986)).

II.     **The Defendant's Motion for Summary Judgment**

The plaintiff asserts a single claim under Title VII of the Civil Rights Act of 1964, alleging that her termination (and the investigations leading up to her termination) were in retaliation for the plaintiff filing her August 28, 2007 EEOC Charge. (Docket No. 1.) To establish a *prima facie* case of Title VII retaliation, a plaintiff must demonstrate that (1) she engaged in activity protected by Title VII; (2) the exercise of her protected rights was known to the defendant; (3) she was subject to an adverse employment action or severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792-93 (6th Cir. 2000). If the plaintiff meets this burden, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. *Id.* If the defendant makes this showing, the burden shifts back to the plaintiff to show that the defendant's explanation is pretext. *Id.*

In support of its motion, the defendant argues that there is no evidence of a causal connection between the investigation/termination of the plaintiff and the EEOC Charge. (Docket No. 55 at 16-17.) Rather, the record clearly shows that Hudson (1) received a large number of complaints about the plaintiff, (2) reasonably ordered her subordinates to address these

9

complaints with Jordan, and (3) when, after several months and numerous meetings with the plaintiff, the complaints still kept coming, Hudson, along with Riley, ordered the plaintiff terminated for clear violations of workplace policy. (*Id.*) The defendant maintains that, although the Charge happened to be filed before many of these complaints were received, there remains absolutely no evidence of a connection between the course of events that resulted in termination and the August 2007 EEOC Charge. (*Id.*)

In response, the plaintiff's central argument is that, in her deposition, Hudson "admitted that [Kohl's] instituted a purposeful policy of retaliation against Linda Jordan from the moment she filed her EEOC Charge" and that Hudson directed Childs, one of the plaintiff's alleged tormenters, to lead the investigations against her. (Docket No. 64 at 2, 5-6 citing Docket No. 64 Ex. 2 at 185-187.) This is a clear mis-characterization of Hudson's testimony and distorts the record. Hudson testified that, in light of the fact that the plaintiff had previously had issues with Childs, she ordered that Childs elevate all issues with the plaintiff to her, so that she could make sure that the plaintiff was being treated fairly by Childs and everyone else. (Docket No. 64 Ex. 2 at 185-87.) Hudson explicitly testified that, in light of the past interaction between Childs and the plaintiff, she ensured that Childs had "partners" in conducting investigations regarding the plaintiff, to guarantee that Childs "wasn't in charge of making [] decisions on his own." (*Id.*) The plaintiff's central argument in response is based on a clear mis-characterization of Hudson's testimony.

Assuming that the plaintiff has satisfied the first three elements of the *prima facie* test[5],

---

[5]Hudson testified at her deposition that she was aware during the relevant time period that the plaintiff had filed her August 2007 EEOC Charge. (Docket No. 56 Ex. 4 at 74.)

there is no evidence linking her August 2007 EEOC Charge to the investigations and subsequent termination. Rather, the only reasonable reading of the record is that the investigations and subsequent termination occurred because Hudson determined that the plaintiff had a chronic problem working productively with others at Kohl's, as was pointed out on three different employment evaluations, all of which were completed prior to the EEOC Charge being filed. The plaintiff's alleged nasty tone and demeanor is further demonstrated by the September 16, 2007 e-mail, in which the plaintiff publicly castigated a store manager for failing to promptly adjust the lights in the store. Consistent with this, from September 2007 through March 2008, there was a parade of associates and co-workers of the plaintiff who, of their own accord, submitted complaints about the plaintiff to Hudson. (*See* Docket Nos. 59-62.)

While the pace of the complaints apparently quickened after the EEOC Charge was filed, complaints regarding the plaintiff's temperament date back to 2004, and there is no evidence supporting any sort of "conspiracy" amongst the plaintiff's co-workers. The September 16, 2007 e-mail (along with the affidavits of disinterested former co-workers) validates the notion that the plaintiff truly was the one "stirring the pot" and agitating her co-workers with her attitude. In short, the reason for the investigation and termination of the plaintiff is obvious from the record, and it had nothing to do with the EEOC Charge. In the absence of evidence of any causal connection, the plaintiff has failed to make out her *prima facie* case, and it is not necessary to engage in the burden-shifting analysis.[6] The plaintiff's Title VII retaliation claim will be

---

[6] The plaintiff also cites two Sixth Circuit cases, *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 589 (6th Cir. 2009) and *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 436 (6th Cir. 2009) for the proposition that a "close temporal proximity" between the filing of the Charge and the adverse employment action is sufficient to establish a causal connection for purposes of the

dismissed.

## III. Attorneys' Fees

The defendant also seeks its attorneys' fees in connection with defending this litigation. (Docket No. 55 at 20.) Making no formal motion and providing no supporting case law, the defendant simply requests these fees at the conclusion of its briefing materials. (*See id.*)

In the Title VII civil rights action context, courts may "award attorneys' fees to a defendant only where a plaintiff's claims are unreasonable, frivolous, groundless or vexatious." *Yinger v. City of Dearborn*, 1997 WL 735323, *5 (6th Cir. Nov. 18, 1997). The Sixth Circuit has also noted that "an award of attorney fees against a losing plaintiff in a civil rights action is an extreme sanction, and must be limited to truly egregious cases of misconduct." *Tahfs v. Proctor*, 316 F.3d 584, 596 (6th Cir. 2003)(internal quotation omitted). The court is also not to engage in "post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation." *Id.*

While discovery and briefing have shown that the plaintiff's claims are without merit, the

---

*prima facie* test. (Docket No 64 at 5-6.) Neither of these cases stands for the proposition that, when an investigation/termination roughly follows the filing of an EEOC Charge, the plaintiff has automatically satisfied the causation element of the test. Rather, these cases stand for the notion that the entire record must be considered and that, when there is "close" or "very close temporal proximity" between the Charge and the adverse action or heightened scrutiny, the plaintiff has done considerable (and sometimes sufficient) work advancing the causation argument. *Hamilton*, 556 F.3d at 435-36; *Upshaw*, 576 F.3d at 589. Here, to a reasonable juror, the abundant evidence in the record discrediting the notion of a causal connection would overwhelm any rough temporal connection between the Charge and the investigation and termination. Moreover, there is not particularly "close" temporal proximity here – it was eight months between the filing of the Charge and the plaintiff's termination, and, aside from the September 2007 meeting brought about by the plaintiff's mass e-mail, Hudson did not order a meeting between the plaintiff and her superiors until January 2008, more than four months after the filing of the Charge.

court cannot conclude, on this record, that this is the type of "extreme" case that warrants the sanction of attorneys' fees against the plaintiff. For instance, there is no indication from the record that the plaintiff or her counsel engaged in vexatious tactics throughout this litigation, and there is nothing before the court to indicate that the plaintiff did not actually believe that she had been the victim of retaliation. Therefore, while the court believes that this case was not close and understands the frustration and expense of defending such a case, this is not an example of the truly rare case in which a plaintiff should be sanctioned for asserting a discrimination claim.

## **CONCLUSION**

For the reasons discussed herein, the defendant's Motion for Summary Judgment will be granted, and this case will be dismissed.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge